UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11567-RGS

NANCY GESHKE, individually
and as guardian of N.K., a minor

v.

CROCS, INC.,

MEMORANDUM AND ORDER ON
CROCS, INC.'S MOTION FOR SUMMARY JUDGMENT

September 7, 2012

STEARNS, D.J.

This case arose from a regrettable accident on an escalator at the Massachusetts

Bay Transportation Authority (MBTA) Aquarium Station.  N.K., an eight-year-old girl,

caught her shoe in the side skirt of the escalator, injuring her toe.  N.K.'s shoe was a

popular clog design marketed under the trade name CROCS, by Crocs, Inc. (Crocs),

a Delaware corporation with an expansive worldwide distribution network.  A five-

count Complaint brought on N.K.'s behalf by her mother, Nancy Geshke, alleges a

design defect in the CROCS shoe and a failure on the part of Crocs to warn of the

latent danger CROCS shoes posed to young children riding escalators.[1]

---

[1] Nancy Geshke purchased the pair of children's size 1-3 CROCS from a Crocs
retail outlet in Santa Monica, California, on September 5, 2009.  According to Geshke,
there were no warning tags attached to the shoes or their packaging.  Geshke Dep. at

Discovery now being complete, Crocs moves for summary judgment.  Crocs contends that Geshke's failure to support her claim of a design defect (or the feasability of an "alternative 'safer' design") with expert testimony precludes a jury finding of liability.  With respect to the failure-to-warn claim, Crocs maintains that Geshke's disregard of the conspicuous warnings posted by the MBTA at the entrance to the escalator obviates any suggestion that an earlier (and redundant) admonition from Crocs would have influenced Geshke's conduct, and through her, that of N.K.

Geshke contends that expert testimony is unnecessary because Crocs itself – in response to prior accidents and the "irrefutable testing and findings of the Japanese government" – has shown that it is possible to design a safer version of the CROCS shoe.  Opp'n Mem. at 1-2.  Moreover, Geshke alleges that she would never have purchased the CROCS for N.K. had she known of the risk of the shoe becoming entangled in an escalator.  Geshke maintains that her testimony to that effect is sufficient to meet her burden of raising a jury-worthy issue of disputed fact on the issue of causation.

## BACKGROUND

The following undisputed facts are taken from Crocs's Statement of Facts (SOF)

---

72.

- Dkt # 61, and Geshke's Statement of Additional Facts (SOAF) - Dkt # 64.

In July of 2010, Nancy Geshke, eight-year-old N.K., her nine-year-old brother, and their father, Dr. Peter Kerndt (Nancy Geshke's husband), visited Boston on a vacation trip.  On July 19, 2010, the Geshke family boarded an MBTA escalator at the Aquarium Station carrying patrons to the lower-level train platform.   There were conspicuous warnings posted at the entrance to the escalator.  A bright yellow sign depicted a woman standing next to her child on an escalator and holding the child's hand, accompanied by the following text:

> CAUTION - Passengers Only - No Bare Feet - Hold Handrail - Attend Children - Avoid Sides.

A second yellow warning sign cautioned:

> SAFETY RULES - 1. No Strollers; 2. Hold handrails; 3. Keep tennis shoes away from sides; 4. No bare feet; 5. Always face forward; 6. No children unattended.  PARENTS - Your children must obey these rules.

While Nancy Geshke and her husband do not dispute the presence of the warning signs, they each testify as to having no memory of having seen them.[2]  They

---

[2] Geshke makes much of the testimony of Tia Mattson, Crocs's Director of Global Public Relations, that during a 2009 family vacation in Hawaii with her husband and CROCS-wearing twelve-year-old stepson, she did not recall seeing warning signs at the entrances to the escalators or moving sidewalks at the Denver or Honolulu airports.  Pl.'s Ex. 20 – Mattson Dep. at 16.  The relevance of Mattson's testimony is doubtful at best, as it would not be admissible at trial on the issue of the legal consequences of the warnings posted at the Aquarium Station or whether Geshke's admitted failure to heed them is fatal to her claim.

do admit to having seen similar warning signs while riding escalators elsewhere.

As the Geshke family stepped onto the escalator, N.K. and her brother went first, several steps ahead of their parents.  N.K. was approximately five steps (one witness testified that she was three steps) in front of her mother.  Nancy Geshke testified that at ages eight and nine, she felt the children were mature enough to ride the escalator without adult supervision.  As the escalator descended, N.K.'s right foot became caught between the moving step and the escalator's static side skirt.  Nancy Geshke could see her daughter's right foot "contorted, turned, and standing up" at a 90 degree angle. Geshke Dep. at 57.

Hearing N.K. scream, Waleata Odware, an MBTA employee at Aquarium Station, saw N.K. with her right CROC trapped in the side skirt of the escalator. Odware could see that N.K.'s foot was still in the shoe.  Her foot had been twisted sideways as the escalator pulled her downward.  Fearing that N.K. might be dragged into the comb plate at the bottom of the escalator, Odware attempted to halt the escalator, but was unable to engage the braking mechanism.  N.K.'s father also frantically pressed the escalator's emergency stop button, but with no immediate result.

Alan Dumont, a fellow passenger, witnessed the accident.  As he reached the bottom of the escalator, he heard screaming.  He turned and saw N.K. and her mother.

It was apparent that N.K.'s foot had been caught in the escalator. After a futile attempt to engage the emergency stop button, Dumont ran up the adjacent staircase to assist Nancy Geshke in freeing N.K.'s foot. Dumont saw that N.K.'s "right shoe got ingested and pulled her toe, her big toe into the side of the escalator." Pl.'s Ex. 4. – Dumont Dep. at 9. Dumont testified that, at that point, "we were in a panic. It was coming to the end of the runoff . . . ." *Id.* In an effort to stop the escalator, Dumont, with as much force as he could summon, jammed the heel of his right sneaker into the side aperture of the moving escalator. Ultimately, Dumont was able to extricate N.K.'s foot from her shoe. He testified that "[t]he mother seemed to be overcome by anxiety or the situation, I helped lift her up, she was about to faint, and I pulled the mother to the side, and I was telling her that her daughter was okay." *Id.* The escalator came to a stop some 15 to 20 seconds after N.K.'s foot was freed.

In the aftermath of the accident, John Flynn, a KONE Corporation (the manufacturer and installer of the escalator) mechanic, responded to an MBTA service call.[3] Flynn inspected the escalator and found it to be in "safe working order." He contacted an inspector at the Massachusetts Department of Public Safety, who gave permission to put the escalator back in service. *See* Pl.'s Ex. 6 – Flynn Dep. at 51, 65,

---

[3] Flynn has been employed by KONE as an escalator and elevator maintenance technician since 1962. During his career, he has responded to a number of escalator entrapment incidents. SOAF ¶ 18.

and 78-79.

In May of 2008, the Japanese Ministry of Economy, Trade and Industry (METI) issued a "Findings Report for Study of Sandal Entrapment Accidents in Escalators." The study was conducted by Japan's National Institute of Technology and Evaluation (NITE). The study analyzed various types of footwear "and their relation to escalator entrapment."[4]   *Id*. at 1.   It was prompted by "the alarming frequency of these accidents" – "a total of 66 . . . as of the end of March [of 2009]." *Id.*   The style of shoe that appears to most resemble a CROCS was identified in the study as a "resin sandal."  NITE's testing determined that a sandal shoe design figured in 65 of the 66 entrapments that had been reported.  NITE conducted thousands of tests on resin sandals, rubber boots, sneakers, and flip-flop sandals using different models of escalators.  Of the 66 entrapments NITE was able to replicate, all but two involved resin sandals.  *Id*. at 14-18.  Video footage of NITE's testing includes a sandal with what appears to be the "CROCS" brand name stamped on its foot strap, being turned and stuck in the side of an escalator, although the report does not identify the CROCS

---

[4] The study is available on the Japanese government's website at www.nite.go.jp/jiko/e/monitor/2008pdf/fy2008_sandals.pdf  (last visited Sept. 7, 2012).  Geshke provided the court with a DVD of the physical testing and a written copy of the study itself. *See* Pl.'s Ex. 8. At oral argument, Crocs's counsel agreed that the currently posted version of the report differs in some respects from the one attached to Geshke's summary judgment pleadings.

make by name.  *See* Pl.'s Ex. 9.

In the wake of the study, on May 1, 2008, Shigeo Moridaira, the general manager of Crocs-Japan, emailed his colleagues in the United States describing "one of the urgent and most important requests," namely, METI had requested that Crocs develop a "harder cros-lite" material for its footwear marketed in Japan and that it find a "more less friction cubic dip film or paint."  Pl.'s Ex. 11.  He added that because of the "escalator issue Ministry asked us to start selling new products which can reduce accident by end of July . . . mid of May they want to test with those samples."  *Id.*

On May 14, 2008, John McCarvel, then Crocs's Vice-President for Asia and worldwide management,[5] sent an email to his subordinates in Crocs-Japan , attaching photographs to be used at the "meeting with METI on Thursday" showing Crocs's "redesign" of the CROCS shoe.  *See* Pl.'s Ex. 12 at 1.  On July 15, 2008, Megan Welch, Crocs's senior director of merchandising, told McCarvel and Erik Olson[6] that

---

[5] In February of 2010, McCarvel became Crocs's CEO.

[6] Erik Olson is currently Crocs's Director of Product Development.  Crocs identified him during discovery as a person with knowledge of the design, manufacturing, testing, and footwear specification of CROCS shoes.  Among his areas of identified expertise were Crocs's responses to safety concerns expressed by METI and the U.S. Consumer Product Safety Commission.  Olson testified to the redesign of a CROCS shoe with a reduced co-efficient of friction, but over plaintiff's objections, asserted attorney-client privilege when asked further questions about the design and testing of the original CROCS shoe.  *See* SOAF ¶¶ 34-37.

the new CROCS design would take into account "friction [as] the most important factor," and that the re-design would incorporate "increased hardness." Ultimately, Crocs decided against a recall of its Japan stock of the original design CROCS shoes because the "[M]inistry has not asked us to pull the current product, they have just asked us to bring a safer, improved product to market."[7] Welch further wrote that Crocs's redesigned footwear "should suffice as a long term solution," which it intended to "propose to [the] Japanese ministry showing test results of changes in friction, hardness, etc."[8]

On August 8, 2008, Olson and others on Crocs's Engineering Change Committee were asked to approve (or reject) an Engineering Change Order (ECO) as a prelude to releasing the redesigned CROCS "Kids Blaze" shoe in Japan and ("later") in "other countries in Asia."[9] According to the ECO, the Kids Blaze would be made of a harder material and coated with a matte (non-glossy) finish. The Kids Blaze would also be sold with an escalator warning hangtag. The Kids Blaze was introduced in Japan as an alternative to the traditional CROCS model shoe, but was later pulled

---

[7] Pl.'s Ex. 13 - July 15, 2008 email from Megan Welch.

[8] *Id*. On July 22, 2008, Welch sent an email to Olson and McCarvel asking whether the testing on the newly designed footwear "all produce the same friction results, or is one more slippery than the others?" Pl.'s Ex. 14 - July 22, 2008 email.

[9] Pl.'s Ex. 15 - August 8, 2008 email from Rita Gariss.

from the market because almost no one wanted to buy it.

Sarah DiMartino, currently the manager of Crocs's customer service department, testified that she had received (maybe more than twenty; definitely more than ten) "complaints of CROCS being trapped in an escalator."  Pl.'s Ex. 19 – DiMartino Dep. at 8.   DiMartino created an escalator incident form for Crocs personnel to use when fielding escalator entrapment complaints.  *Id*. at 55-56.  She designed the form with the object of obtaining consistent information from complainants.  *Id*. at 57-58.

DiMartino's records indicate that a handful of customers mentioned that they had heard of "other similar incidents."[10]  At least one parent inquired whether there was an issue with the "material used for CROCS that would contribute to feet getting caught in escalators."  *Id*. at 89.  DiMartino's standard response was to assure callers that "CROCS was committed to safety," "that CROCS shoes are safe and do not present a hazard," and that "CROCS continues to monitor the use and safety performance of its footwear."  *Id*. at 106.  In most cases, DiMartino and her co-workers would offer to send a complimentary replacement pair of CROCS to

---

[10] Geshke contends that Crocs received more than 300 reports ("directly or indirectly") that children wearing CROCS shoes had been involved in entrapment incidents on moving escalators.  Crocs has not acknowledged an exact number of incidents, only that it has received reports of accidents.

consumers who complained about a mangled shoe. DiMartino did not follow up with

parents who complained, nor was she aware of anyone else at Crocs who did so. *Id.*

at 111.

Nancy Geshke filed this action on behalf of N.K. and herself individually

against Crocs in September of 2010.[11] Crocs filed a third-party complaint against

KONE and the MBTA on October 28, 2010. The third-party complaint was dismissed

with prejudice on June 18, 2012. The summary judgment motion by Crocs is the only

motion presently pending before the court.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). "To succeed, the moving party must show that

there is an absence of evidence to support the nonmoving party's position." *Rogers

v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). "[C]onjecture cannot take the place of

proof in the summary judgment calculus." *Bennett v. Saint-Gobain Corp.*, 507 F.3d

23, 31 (1st Cir. 2007). Rule 56 "mandates the entry of summary judgment . . . upon

---

[11] The Complaint alleges claims of negligence (Count I); breach of express and implied warranties (Count II); defective design (Count III); loss of consortium (Count IV); and punitive damages based on a "willful pattern of wanton and depraved indifference" (Count V).

10

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Crocs moves for summary judgment asserting that Jerry Leyden, Geshke's designated expert witness, is unable to "testify that Crocs' shoes are inherently defective as designed, or the feasibility of any alternative 'safer' design," both of which are essential elements of a defective design claim under Massachusetts law. Crocs also contends that Geshke's failure-to-warn claim fails because of her inability to show causation in light of the fact that she was presented with conspicuous warnings about the dangers of letting young children ride unsupervised on an escalator immediately prior to the accident, warnings which she failed to heed. "Therefore, as a matter of law, no warning from Crocs – at the point of sale eight months earlier – could have changed the circumstances of what occurred." Def.'s Mem. at 2.

The first point of dispute is whether Geshke's claims are to be resolved under Massachusetts or California law. Crocs, a Delaware corporation with a principal place of business in Colorado, argues that Massachusetts law applies. Geshke, a California citizen who purchased the CROCS in California, asserts that California products liability law is governing (although she opted to file the action in Massachusetts and cites only to Massachusetts cases in her brief).

Massachusetts has supplanted the traditional choice of law rule, which looked to the substantive law of the state where the alleged wrong occurred, with the "functional" approach of Restatement (Second) of Conflict of Laws (1971). *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985). The "new" approach notwithstanding, under § 145 of the Restatement, unless another state has a more significant relationship to the underlying cause of action, tort claims remain governed by the law of the state in which the alleged injury occurred.[12] *See Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170, 174 (D. Mass. 2010), citing *Cohen v. McDonnell Douglas Corp.*, 389 Mass. 327, 333-334 (1983). *See also Lou v. Otis Elevator Co.*,

---

[12] Restatement (Second) of Conflict of Laws § 145 provides as follows:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Restatement (Second) of Conflict of Laws] § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

77 Mass. App. Ct. 571, 583-584 (2010) ("Massachusetts generally follows a functional approach to resolving choice of law questions on substantive matters, eschewing reliance on any particular choice-of-law doctrine. . . .  Though we do not tie our analysis to any single doctrine, examination of our cases reveals that we often find useful guidance in the Restatement (Second) of Conflict of Laws.").   As the "contacts" identified by the Restatement as the critical considerations to be weighed in deciding the choice of law lean heavily towards the choice of Massachusetts (particularly § 145(2)(a), (b), and (d)), the court will apply Massachusetts law.  *See Pevoski v. Pevoski*, 371 Mass. 358, 359 (1976) ("In this Commonwealth, lex loci delicti has been firmly established as the general tort conflicts rule.").

Count I - Negligence/Negligent Design

Proof of design negligence requires satisfaction of the following elements:  (1) the manufacturer's failure to exercise a reasonable degree of care under the circumstances;[13] (2) proximate causation; and (3) injury and/or loss.  *See Ulwick v.*

---

[13] "A manufacturer is under a duty to design its product with reasonable care to eliminate avoidable dangers." *Simmons v. Monarch Mach. Tool Co.*, 413 Mass. 205, 211 (1992), abrogated on other grounds by *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1 (1998).  However, there is no duty on the part of the manufacturer to design a product that is risk free or risk proof; nor does the manufacturer have a duty to guard against dangers which are only remotely possible or highly speculative. *Back v. Wickes Corp.*, 375 Mass. 633, 640-641 (1978).  The test for whether the product is defective is one of reasonableness rather than one of perfection. *See Smith v. Ariens Co.*, 375 Mass. 620, 624 (1978).

*DeChristopher*, 411 Mass. 401, 408 (1991); *Beaver v. Costin*, 352 Mass. 624, 626 (1967); *Scott v. Thompson*, 5 Mass. App. Ct. 372, 374 (1977). "In evaluating the adequacy of a product's design, [the fact-finder] should consider, among other factors, 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.'" *Back*, 375 Mass. at 642, quoting *Barker v. Lull Eng'g Co.*, 573 P.2d 443, 455 (Cal. 1978). *See also Uloth v. City Tank Corp.*, 376 Mass. 874, 880-881 (1978) ("[T]here is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery.").

Crocs maintains that Geshke's design negligence claim fails as a matter of law because her expert witness, Jerry Leyden, is unable to opine on any of the crucial issues involving matters of product design.[14]

Because plaintiffs' defect claim inherently turns on the interplay between

----

[14] Leyden concedes that he has never seen any of the design or testing specifications for the Kids Blaze model shoe – or for any other model of CROCS shoes. Leyden Dep. at 195-196. Leyden did no analysis of the engineering changes between N.K.'s allegedly dangerous CROCS design and the Kids Blaze line, nor has he suggested an alternative feasible and safer design. *Id.* Leyden also testified that he has no opinion as to whether the Kids Blaze shoe would perform any differently than any other shoe if entrapped in an escalator. *Id.* at 196-197.

footwear and an escalator, it implicates particularly complex engineering
issues such as the physical characteristics of the materials that comprised
N.K.'s shoes, the forces placed on the shoe when it made contact with
the sidewall, the effect of the escalator's speed, the impact of the gap
between the step and the sidewall, and the amount of friction created by
the improperly maintained escalator – just to name a few.

Def.'s Reply Mem. at 4.  Geshke rather oddly responds that Leyden "was never

disclosed as an expert on the issue of defective design," Opp'n Mem. at 5 n.1 – oddly,

because it is not clear what role Geshke envisions for Leyden other than that of an

expert witness at trial.  From the pleadings, it appears that Geshke intends to forgo

expert testimony, and rely simply on "Crocs' own admissions and the irrefutable

METI findings to establish CROCS' defective design."[15]  *Id.*

With regard to the METI-NITE findings, Geshke contends that "the Japanese

government . . . concluded that CROCS were far more susceptible to escalator

entrapments than any other type of footwear tested."[16]  Opp'n Mem. at 6.  While one

---

[15] Geshke does not argue that this is one of those rare cases in which the doctrine
of *res ipsa loquitur* renders expert evidence unnecessary. *See Lipman v. Lustig*, 346
Mass. 182, 184 (1963); *Edwards v. Boland*, 41 Mass. App. Ct. 375, 379-380 (1996).
Rather, she contends that the METI report, complaints of prior instances of escalator
entrapment, and the Kids Blaze design are sufficient to reach a jury on the defective
design claims.  As will be shown, none of this proffered evidence would be admissible
at trial.

[16] This statement as to what "the Japanese government concluded" is simply not
true and appears nowhere in the NITE report.  What the NITE report does say is that
of the four types of shoes it tested, "resin sandals" were the most likely to become
entrapped in an escalator.  NITE relates that it purchased seven different makes of resin

of the NITE videos appears to show a shoe with the name "CROCS" imprinted on a foot strap (it is difficult for the court to discern with any certainty), this cameo glimpse of a single purported CROCS shoes is insufficient to render the NITE report, and more particularly its conclusions as they might relate to CROCS shoes, admissible at trial. Moreover, the METI-NITE report has never been properly authenticated.  *See* Fed. R. Evid. 902(3) (setting out the requirements for authenticating a foreign public document, including its certification by an appropriate foreign official or a U.S. consular officer); *United States v. De Jongh*, 937 F.2d 1, 4 (1st Cir. 1991) (finding a public document inadmissible where its proponent failed to comply with the requisites of Rule 902); *Starski v. Kirzhnev*, 2011 WL 923499, at *5 (D. Mass. Mar. 15, 2011) (same).

Even assuming that the requirements of Rule 902 had been met, there is nothing in the NITE report that Geshke connects by expert testimony or other evidence to the specific facts of N.K.'s case.  Specifically, there is no identification of the make or model of the shoes involved in the NITE entrapment replications (NITE tested seven undifferentiated types of resin sandal); the model of the escalator specific to each

---

sandals for testing purposes, but the report identifies none of them by make or model.

entrapment (NITE conducted its tests on four different Japanese makes of escalator)[17]; the sandals' contact location; the tensile and compression loads; the "hardness" or "thickness" of the sandals; the dynamic friction coefficient; and/or the angle of the entrapment. *See* Pl.'s Ex. 8 at 11-15, 22-30.[18]  Rule 702 of the Federal Rule of Evidence admits the opinion testimony of an expert witness where the opinion will "assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702 is particularly relevant when scientific and technical matters are critical to the resolution of disputed facts.  Without expert testimony reliably relating the contents of the METI-NITE report and its conclusions to the circumstances of N.K.'s accident, the report is doubly inadmissible.[19]

　　With regard to Geshke's second category of proposed evidence, even assuming

---

[17] In attempting to replicate the escalator entrapments, NITE subjected eleven different shoe models to 60 tests on four different makes of escalator (2,400 tests total). The first escalator, which was treated with a low-friction material (as required by Japanese industry codes), did not entrap any resin sandals; the second untreated escalator entrapped one; the third untreated escalator entrapped ten; and the fourth untreated escalator entrapped 60 sandals.  Pl.'s Ex. 8 at 14-15.

[18] Olson testified that he has no knowledge of any government or private entity that "conducted side-by-side testing of CROCS as against other types of footwear on different escalators to determine the number of times in which the shoes were entrapped in escalators."  Pl.'s Ex. 16 - Olson Dep. at 235.

[19] "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

the accuracy of Geshke's estimate of some 300 (almost all unidentified) incidents of CROCS escalator entrapments, Geshke offers no evidence about the circumstances in which these alleged entrapments occurred, their cause, whether any personal injury resulted, the types of escalator involved (or their condition), or whether warnings had been posted and ignored. *See* Fed. R. Evid. 401.

Finally, Geshke's evidence of "Crocs' own admissions" boils down to this. Geshke maintains that Crocs concedes the existence of a safer and feasible alternative design – the Kids Blaze model – and that this is enough to establish her defective design claim. In the first instance, Crocs concedes nothing of the sort. Moreover, while it is undisputed that Crocs designed the Kids Blaze model to mollify METI's concerns, Geshke offers no evidence that the Kids Blaze design was in fact safer for a child to wear while riding an escalator or that the Japanese government ever required any permanent change in the design of CROCS shoes sold in Japan.[20]

Count I - Negligence, Failure to Warn

A manufacturer has a duty to provide the "average" consumer with adequate warnings and instructions about the nature and extent of any foreseeable danger accompanying the use or foreseeable misuse of the product. *See Mitchell v. Sky*

---

[20] Crocs states without contradiction that the Kids Blaze model is no longer sold in Japan because of a lack of enthusiasm for the product and a preference for the original CROCS model among consumers.

*Climber, Inc.*, 396 Mass. 629, 631 (1986); *H.P. Hood & Sons, Inc. v. Ford Motor Co.*, 370 Mass. 69, 75 (1976); *Welch v. Keene Corp.*, 31 Mass. App. Ct. 157, 163 (1991).  A product may also be deemed defective by reason of a failed warning if the omitted or inadequate notice or instruction would have reduced or avoided the foreseeable risks of harm.  *See* Restatement (Third) of Torts: Products Liability § 2(c) (1998).  A manufacturer, however, has no duty to warn users of a possible risk that is outside the zone of foreseeable use or misuse of the product.  *Mitchell*, 396 Mass. at 632.

In this case, in light of the undisputed facts, whether Geshke failed to read the posted warnings, or simply disregarded them, Crocs persuasively argues that an earlier redundant warning would have done nothing to avert N.K.'s accident.  When an existing warning[21] "clearly called attention to the dangers to be avoided" and "there [is] no evidence that an additional or different warning would have so alerted the plaintiff [so] that the accident would not have occurred," no reasonable jury could find for a plaintiff on a failure-to-warn theory.  *Bell v. Wysong & Miles Co.*, 26 Mass. App. Ct. 1011, 1013 (1988) (reversing the trial court and dismissing a failure to warn claim on this basis).  *See also Plante v. Hobart Corp.*, 771 F.2d 617, 621 (1st Cir. 1985)

---

[21] As related earlier, KONE, the manufacturer of the Aquarium escalator, and the MBTA, its operator, posted signs warning riders to "Avoid sides," "Always face forward," "Attend children," and "Keep tennis shoes away from sides."

(affirming directed verdict for manufacturer when the court could "not see how one can reasonably say that defendants were negligent in failing to furnish even more warnings about the dangers" at issue); *Bavuso v. Caterpillar Indus., Inc.*, 408 Mass. 694, 701-702 (1990) (reversing jury verdict and the district court's entry of judgment in favor of the plaintiff because "a warning beyond the warnings given could not have made the danger any more obvious").[22]

Count II - Breach of Express[23] and Implied Warranties

---

[22] Crocs also argues that the open and obvious danger posed by escalators to young children precludes recovery on a failure-to-warn theory.  There is no liability for failing to warn "of a risk or hazard which [the consumer] appreciated to the same extent as a warning would have provided." *Slate v. Bethlehem Steel Corp.*, 400 Mass. 378, 382 (1987).  *See also Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 275 (1st Cir. 2003).  Crocs claims that "Geshke admitted that she was aware of the open and obvious danger of escalators; [and that] she acknowledged warning her children about escalators when they were younger because it was 'common sense' that 'a moving staircase' presented a risk of injury." Def.'s Mem. at 16.  This is a mischaracterization of Geshke's testimony.  She stated that "she didn't want [her children] to play on them [escalators]" . . . but . . . [she] didn't think of them as dangerous in the sake of them really getting hurt.  I think I might have thought that there could be an accident, but I didn't think of them as dangerous." Geshke Dep. at 37.  Nonetheless, Geshke's proffer that had the CROCS shoes carried a point-of-sale hangtag warning of the dangers of escalators, she would never have purchased them for N.K., and therefore the accident would never have happened, is too speculative to be admissible at trial. *See Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 15 n.8 (1st Cir. 2001).  Because Geshke was provided with an adequate warning immediately prior to the accident, it is unnecessary for the court to consider Crocs's second line of defense on the failure-to-warn claim.

[23] Geshke does not allege any express warranty on the part of Crocs, other than noting an advertising claim that Crocs sells "all purpose shoes for comfort and

Under Mass. Gen. Laws c. 106, § 2-314,  "a warranty that the goods shall be merchantable is implied in a contract for their sale . . . . Goods to be merchantable must at least be . . . fit for the ordinary purposes for which such goods are used . . . . " Massachusetts equates "a breach of the implied warranty of merchantability, that goods be 'fit for the ordinary purposes for which such goods are used,' [Mass. Gen. Laws ch.] 106, § 2-314(2)(c), with the sale of an 'unreasonably dangerous' product" as set forth in Restatement (Second) of Torts § 402A(1) (1965).[24]  *Commonwealth v. Johnson Insulation*, 425 Mass. 650, 660 (1997).  S*ee also Haglund v. Philip Morris, Inc.*, 446 Mass. 741, 746 (2006) ("Warranty liability is . . . 'congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965).").  "A product may be unreasonably dangerous because of a defect in design. . . . Alternatively, a product may be considered to be unreasonably dangerous because of the absence of an adequate warning, sufficient to alert those who may be sensitive

─────────────────

fashion."  Compl. ¶ 29.

[24] Restatement (Second) of Torts § 402A(1) provides,

One who sells any product in a defective condition unreasonably dangerous to the user of consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

to the product and to allow users to balance the risk of harm against the product's social utility." *Johnson Insulation*, 425 Mass. at 661; *see also Haglund*, 446 Mass. at 747 ("Warranty liability may be premised either on the failure to warn . . . or . . . on defective design.").  Because Geshke is unable to prevail on either of her negligence claims (defective design and failure-to-warn), it follows that the implied warranty claim fails as well.[25]

ORDER

For the foregoing reasons, the motion for summary judgment is <u>ALLOWED</u>. The Clerk will enter judgment for Crocs, and close the case.

SO ORDERED.

/s/ Richard G. Stearns

---

[25] The remaining counts of Geshke's Complaint can be summarily addressed. Count III (Defective Design) is duplicative of the failed negligence claim in Count I. "[A] claim for loss of consortium [Count IV] requires proof of a tortious act that caused the claimant's spouse [or child] personal injury. . . . Although we have determined that a claim for loss of consortium is independent of the spouse's cause of action, . . . we have not repudiated the implicit prerequisite that the injured spouse have a viable claim." *Sena v. Commonwealth*, 417 Mass. 250, 264 (1994).  As Geshke's negligence claims do not survive, neither does this claim.  *See also Doe v. D'Agostino*, 367 F. Supp. 2d 157, 178 (D. Mass. 2005).  Punitive damages (Count V) may not be awarded unless authorized by statute.  *See Flesner v. Technical Commc'ns Corp.*, 410 Mass. 805, 813 (1991).  The only statutory claim, Count II (breach of an implied warranty, Mass. Gen. Laws ch.106, § 2-314), does not authorize an award of punitive damages (even assuming the negligence/implied warranty claim were to survive summary judgment).

22

_____

UNITED   STATES   DISTRICT   JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11567-RGS

NANCY GESHKE, individually
and as guardian of N.K., a minor

v.

CROCS, INC.,

MEMORANDUM AND ORDER ON
CROCS, INC.'S MOTION FOR SUMMARY JUDGMENT

September 7, 2012

STEARNS, D.J.

This case arose from a regrettable accident on an escalator at the Massachusetts

Bay Transportation Authority (MBTA) Aquarium Station.  N.K., an eight-year-old girl,

caught her shoe in the side skirt of the escalator, injuring her toe.  N.K.'s shoe was a

popular clog design marketed under the trade name CROCS, by Crocs, Inc. (Crocs),

a Delaware corporation with an expansive worldwide distribution network.  A five-

count Complaint brought on N.K.'s behalf by her mother, Nancy Geshke, alleges a

design defect in the CROCS shoe and a failure on the part of Crocs to warn of the

latent danger CROCS shoes posed to young children riding escalators.[1]

---

[1] Nancy Geshke purchased the pair of children's size 1-3 CROCS from a Crocs
retail outlet in Santa Monica, California, on September 5, 2009.  According to Geshke,
there were no warning tags attached to the shoes or their packaging.  Geshke Dep. at

Discovery now being complete, Crocs moves for summary judgment.  Crocs contends that Geshke's failure to support her claim of a design defect (or the feasability of an "alternative 'safer' design") with expert testimony precludes a jury finding of liability.  With respect to the failure-to-warn claim, Crocs maintains that Geshke's disregard of the conspicuous warnings posted by the MBTA at the entrance to the escalator obviates any suggestion that an earlier (and redundant) admonition from Crocs would have influenced Geshke's conduct, and through her, that of N.K.

Geshke contends that expert testimony is unnecessary because Crocs itself – in response to prior accidents and the "irrefutable testing and findings of the Japanese government" – has shown that it is possible to design a safer version of the CROCS shoe.  Opp'n Mem. at 1-2.  Moreover, Geshke alleges that she would never have purchased the CROCS for N.K. had she known of the risk of the shoe becoming entangled in an escalator.  Geshke maintains that her testimony to that effect is sufficient to meet her burden of raising a jury-worthy issue of disputed fact on the issue of causation.

## BACKGROUND

The following undisputed facts are taken from Crocs's Statement of Facts (SOF)

---

72.

- Dkt # 61, and Geshke's Statement of Additional Facts (SOAF) - Dkt # 64.

In July of 2010, Nancy Geshke, eight-year-old N.K., her nine-year-old brother, and their father, Dr. Peter Kerndt (Nancy Geshke's husband), visited Boston on a vacation trip.  On July 19, 2010, the Geshke family boarded an MBTA escalator at the Aquarium Station carrying patrons to the lower-level train platform.   There were conspicuous warnings posted at the entrance to the escalator.  A bright yellow sign depicted a woman standing next to her child on an escalator and holding the child's hand, accompanied by the following text:

> CAUTION - Passengers Only - No Bare Feet - Hold Handrail - Attend Children - Avoid Sides.

A second yellow warning sign cautioned:

> SAFETY RULES - 1. No Strollers; 2. Hold handrails; 3. Keep tennis shoes away from sides; 4. No bare feet; 5. Always face forward; 6. No children unattended.  PARENTS - Your children must obey these rules.

While Nancy Geshke and her husband do not dispute the presence of the warning signs, they each testify as to having no memory of having seen them.[2]  They

---

[2] Geshke makes much of the testimony of Tia Mattson, Crocs's Director of Global Public Relations, that during a 2009 family vacation in Hawaii with her husband and CROCS-wearing twelve-year-old stepson, she did not recall seeing warning signs at the entrances to the escalators or moving sidewalks at the Denver or Honolulu airports.  Pl.'s Ex. 20 – Mattson Dep. at 16.  The relevance of Mattson's testimony is doubtful at best, as it would not be admissible at trial on the issue of the legal consequences of the warnings posted at the Aquarium Station or whether Geshke's admitted failure to heed them is fatal to her claim.

do admit to having seen similar warning signs while riding escalators elsewhere.

As the Geshke family stepped onto the escalator, N.K. and her brother went first, several steps ahead of their parents. N.K. was approximately five steps (one witness testified that she was three steps) in front of her mother. Nancy Geshke testified that at ages eight and nine, she felt the children were mature enough to ride the escalator without adult supervision. As the escalator descended, N.K.'s right foot became caught between the moving step and the escalator's static side skirt. Nancy Geshke could see her daughter's right foot "contorted, turned, and standing up" at a 90 degree angle. Geshke Dep. at 57.

Hearing N.K. scream, Waleata Odware, an MBTA employee at Aquarium Station, saw N.K. with her right CROC trapped in the side skirt of the escalator. Odware could see that N.K.'s foot was still in the shoe. Her foot had been twisted sideways as the escalator pulled her downward. Fearing that N.K. might be dragged into the comb plate at the bottom of the escalator, Odware attempted to halt the escalator, but was unable to engage the braking mechanism. N.K.'s father also frantically pressed the escalator's emergency stop button, but with no immediate result.

Alan Dumont, a fellow passenger, witnessed the accident. As he reached the bottom of the escalator, he heard screaming. He turned and saw N.K. and her mother.

4

It was apparent that N.K.'s foot had been caught in the escalator. After a futile attempt to engage the emergency stop button, Dumont ran up the adjacent staircase to assist Nancy Geshke in freeing N.K.'s foot. Dumont saw that N.K.'s "right shoe got ingested and pulled her toe, her big toe into the side of the escalator." Pl.'s Ex. 4. – Dumont Dep. at 9. Dumont testified that, at that point, "we were in a panic. It was coming to the end of the runoff . . . ." *Id.* In an effort to stop the escalator, Dumont, with as much force as he could summon, jammed the heel of his right sneaker into the side aperture of the moving escalator. Ultimately, Dumont was able to extricate N.K.'s foot from her shoe. He testified that "[t]he mother seemed to be overcome by anxiety or the situation, I helped lift her up, she was about to faint, and I pulled the mother to the side, and I was telling her that her daughter was okay." *Id.* The escalator came to a stop some 15 to 20 seconds after N.K.'s foot was freed.

In the aftermath of the accident, John Flynn, a KONE Corporation (the manufacturer and installer of the escalator) mechanic, responded to an MBTA service call.[3] Flynn inspected the escalator and found it to be in "safe working order." He contacted an inspector at the Massachusetts Department of Public Safety, who gave permission to put the escalator back in service. *See* Pl.'s Ex. 6 – Flynn Dep. at 51, 65,

---

[3] Flynn has been employed by KONE as an escalator and elevator maintenance technician since 1962. During his career, he has responded to a number of escalator entrapment incidents. SOAF ¶ 18.

and 78-79.

In May of 2008, the Japanese Ministry of Economy, Trade and Industry (METI) issued a "Findings Report for Study of Sandal Entrapment Accidents in Escalators." The study was conducted by Japan's National Institute of Technology and Evaluation (NITE).  The study analyzed various types of footwear "and their relation to escalator entrapment."[4]  *Id*. at 1.  It was prompted by "the alarming frequency of these accidents" – "a total of 66 . . . as of the end of March [of 2009]."  *Id.*  The style of shoe that appears to most resemble a CROCS was identified in the study as a "resin sandal."  NITE's testing determined that a sandal shoe design figured in 65 of the 66 entrapments that had been reported.  NITE conducted thousands of tests on resin sandals, rubber boots, sneakers, and flip-flop sandals using different models of escalators.  Of the 66 entrapments NITE was able to replicate, all but two involved resin sandals.  *Id*. at 14-18.  Video footage of NITE's testing includes a sandal with what appears to be the "CROCS" brand name stamped on its foot strap, being turned and stuck in the side of an escalator, although the report does not identify the CROCS

---

[4]  The study is available on the Japanese government's website at www.nite.go.jp/jiko/e/monitor/2008pdf/fy2008_sandals.pdf   (last visited Sept. 7, 2012).  Geshke provided the court with a DVD of the physical testing and a written copy of the study itself.  *See* Pl.'s Ex. 8.  At oral argument, Crocs's counsel agreed that the currently posted version of the report differs in some respects from the one attached to Geshke's summary judgment pleadings.

make by name. *See* Pl.'s Ex. 9.

In the wake of the study, on May 1, 2008, Shigeo Moridaira, the general manager of Crocs-Japan, emailed his colleagues in the United States describing "one of the urgent and most important requests," namely, METI had requested that Crocs develop a "harder cros-lite" material for its footwear marketed in Japan and that it find a "more less friction cubic dip film or paint." Pl.'s Ex. 11. He added that because of the "escalator issue Ministry asked us to start selling new products which can reduce accident by end of July . . . mid of May they want to test with those samples." *Id.*

On May 14, 2008, John McCarvel, then Crocs's Vice-President for Asia and worldwide management,[5] sent an email to his subordinates in Crocs-Japan , attaching photographs to be used at the "meeting with METI on Thursday" showing Crocs's "redesign" of the CROCS shoe. *See* Pl.'s Ex. 12 at 1. On July 15, 2008, Megan Welch, Crocs's senior director of merchandising, told McCarvel and Erik Olson[6] that

---

[5] In February of 2010, McCarvel became Crocs's CEO.

[6] Erik Olson is currently Crocs's Director of Product Development. Crocs identified him during discovery as a person with knowledge of the design, manufacturing, testing, and footwear specification of CROCS shoes. Among his areas of identified expertise were Crocs's responses to safety concerns expressed by METI and the U.S. Consumer Product Safety Commission. Olson testified to the redesign of a CROCS shoe with a reduced co-efficient of friction, but over plaintiff's objections, asserted attorney-client privilege when asked further questions about the design and testing of the original CROCS shoe. *See* SOAF ¶¶ 34-37.

the new CROCS design would take into account "friction [as] the most important factor," and that the re-design would incorporate "increased hardness." Ultimately, Crocs decided against a recall of its Japan stock of the original design CROCS shoes because the "[M]inistry has not asked us to pull the current product, they have just asked us to bring a safer, improved product to market."[7] Welch further wrote that Crocs's redesigned footwear "should suffice as a long term solution," which it intended to "propose to [the] Japanese ministry showing test results of changes in friction, hardness, etc."[8]

On August 8, 2008, Olson and others on Crocs's Engineering Change Committee were asked to approve (or reject) an Engineering Change Order (ECO) as a prelude to releasing the redesigned CROCS "Kids Blaze" shoe in Japan and ("later") in "other countries in Asia."[9] According to the ECO, the Kids Blaze would be made of a harder material and coated with a matte (non-glossy) finish. The Kids Blaze would also be sold with an escalator warning hangtag. The Kids Blaze was introduced in Japan as an alternative to the traditional CROCS model shoe, but was later pulled

---

[7] Pl.'s Ex. 13 - July 15, 2008 email from Megan Welch.

[8] *Id*. On July 22, 2008, Welch sent an email to Olson and McCarvel asking whether the testing on the newly designed footwear "all produce the same friction results, or is one more slippery than the others?" Pl.'s Ex. 14 - July 22, 2008 email.

[9] Pl.'s Ex. 15 - August 8, 2008 email from Rita Gariss.

8

from the market because almost no one wanted to buy it.

Sarah DiMartino, currently the manager of Crocs's customer service department, testified that she had received (maybe more than twenty; definitely more than ten) "complaints of CROCS being trapped in an escalator."  Pl.'s Ex. 19 – DiMartino Dep. at 8.   DiMartino created an escalator incident form for Crocs personnel to use when fielding escalator entrapment complaints.  *Id*. at 55-56.  She designed the form with the object of obtaining consistent information from complainants.  *Id*. at 57-58.

DiMartino's records indicate that a handful of customers mentioned that they had heard of "other similar incidents."[10]  At least one parent inquired whether there was an issue with the "material used for CROCS that would contribute to feet getting caught in escalators."  *Id*. at 89.  DiMartino's standard response was to assure callers that "CROCS was committed to safety," "that CROCS shoes are safe and do not present a hazard," and that "CROCS continues to monitor the use and safety performance of its footwear."  *Id*. at 106.  In most cases, DiMartino and her co-workers would offer to send a complimentary replacement pair of CROCS to

_____

[10] Geshke contends that Crocs received more than 300 reports ("directly or indirectly") that children wearing CROCS shoes had been involved in entrapment incidents on moving escalators.  Crocs has not acknowledged an exact number of incidents, only that it has received reports of accidents.

9

consumers who complained about a mangled shoe.  DiMartino did not follow up with

parents who complained, nor was she aware of anyone else at Crocs who did so.  *Id.*

at 111.

Nancy Geshke filed this action on behalf of N.K. and herself individually

against Crocs in September of 2010.[11]  Crocs filed a third-party complaint against

KONE and the MBTA on October 28, 2010.  The third-party complaint was dismissed

with prejudice on June 18, 2012.  The summary judgment motion by Crocs is the only

motion presently pending before the court.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  "To succeed, the moving party must show that

there is an absence of evidence to support the nonmoving party's position."  *Rogers

v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).  "[C]onjecture cannot take the place of

proof in the summary judgment calculus."  *Bennett v. Saint-Gobain Corp.*, 507 F.3d

23, 31 (1st Cir. 2007).  Rule 56 "mandates the entry of summary judgment . . . upon

---

[11] The Complaint alleges claims of negligence (Count I); breach of express and implied warranties (Count II); defective design (Count III); loss of consortium (Count IV); and punitive damages based on a "willful pattern of wanton and depraved indifference" (Count V).

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Crocs moves for summary judgment asserting that Jerry Leyden, Geshke's designated expert witness, is unable to "testify that Crocs' shoes are inherently defective as designed, or the feasibility of any alternative 'safer' design," both of which are essential elements of a defective design claim under Massachusetts law. Crocs also contends that Geshke's failure-to-warn claim fails because of her inability to show causation in light of the fact that she was presented with conspicuous warnings about the dangers of letting young children ride unsupervised on an escalator immediately prior to the accident, warnings which she failed to heed. "Therefore, as a matter of law, no warning from Crocs – at the point of sale eight months earlier – could have changed the circumstances of what occurred." Def.'s Mem. at 2.

The first point of dispute is whether Geshke's claims are to be resolved under Massachusetts or California law. Crocs, a Delaware corporation with a principal place of business in Colorado, argues that Massachusetts law applies. Geshke, a California citizen who purchased the CROCS in California, asserts that California products liability law is governing (although she opted to file the action in Massachusetts and cites only to Massachusetts cases in her brief).

11

Massachusetts has supplanted the traditional choice of law rule, which looked to the substantive law of the state where the alleged wrong occurred, with the "functional" approach of Restatement (Second) of Conflict of Laws (1971). *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985).   The "new" approach notwithstanding, under § 145 of the Restatement, unless another state has a more significant relationship to the underlying cause of action, tort claims remain governed by the law of the state in which the alleged injury occurred.[12]   *See Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170, 174 (D. Mass. 2010), citing *Cohen v. McDonnell Douglas Corp.*, 389 Mass. 327, 333-334 (1983).   *See also Lou v. Otis Elevator Co.*,

---

[12] Restatement (Second) of Conflict of Laws § 145 provides as follows:

 (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Restatement (Second) of Conflict of Laws] § 6.

 (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

77 Mass. App. Ct. 571, 583-584 (2010) ("Massachusetts generally follows a functional approach to resolving choice of law questions on substantive matters, eschewing reliance on any particular choice-of-law doctrine. . . .  Though we do not tie our analysis to any single doctrine, examination of our cases reveals that we often find useful guidance in the Restatement (Second) of Conflict of Laws.").  As the "contacts" identified by the Restatement as the critical considerations to be weighed in deciding the choice of law lean heavily towards the choice of Massachusetts (particularly § 145(2)(a), (b), and (d)), the court will apply Massachusetts law.  *See Pevoski v. Pevoski*, 371 Mass. 358, 359 (1976) ("In this Commonwealth, lex loci delicti has been firmly established as the general tort conflicts rule.").

    Count I - Negligence/Negligent Design

    Proof of design negligence requires satisfaction of the following elements:  (1) the manufacturer's failure to exercise a reasonable degree of care under the circumstances;[13] (2) proximate causation; and (3) injury and/or loss.  *See Ulwick v.*

―――――――――――――――

[13] "A manufacturer is under a duty to design its product with reasonable care to eliminate avoidable dangers." *Simmons v. Monarch Mach. Tool Co.*, 413 Mass. 205, 211 (1992), abrogated on other grounds by *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1 (1998).  However, there is no duty on the part of the manufacturer to design a product that is risk free or risk proof; nor does the manufacturer have a duty to guard against dangers which are only remotely possible or highly speculative. *Back v. Wickes Corp.*, 375 Mass. 633, 640-641 (1978).  The test for whether the product is defective is one of reasonableness rather than one of perfection. *See Smith v. Ariens Co.*, 375 Mass. 620, 624 (1978).

*DeChristopher*, 411 Mass. 401, 408 (1991); *Beaver v. Costin*, 352 Mass. 624, 626 (1967); *Scott v. Thompson*, 5 Mass. App. Ct. 372, 374 (1977).  "In evaluating the adequacy of a product's design, [the fact-finder] should consider, among other factors, 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.'"  *Back*, 375 Mass. at 642, quoting *Barker v. Lull Eng'g Co.*, 573 P.2d 443, 455 (Cal. 1978).  *See also Uloth v. City Tank Corp.*, 376 Mass. 874, 880-881 (1978) ("[T]here is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery.").

Crocs maintains that Geshke's design negligence claim fails as a matter of law because her expert witness, Jerry Leyden, is unable to opine on any of the crucial issues involving matters of product design.[14]

Because plaintiffs' defect claim inherently turns on the interplay between

---

[14] Leyden concedes that he has never seen any of the design or testing specifications for the Kids Blaze model shoe – or for any other model of CROCS shoes.  Leyden Dep. at 195-196.  Leyden did no analysis of the engineering changes between N.K.'s allegedly dangerous CROCS design and the Kids Blaze line, nor has he suggested an alternative feasible and safer design.  *Id.*  Leyden also testified that  he has no opinion as to whether the Kids Blaze shoe would perform any differently than any other shoe if entrapped in an escalator.  *Id.* at 196-197.

14

footwear and an escalator, it implicates particularly complex engineering issues such as the physical characteristics of the materials that comprised N.K.'s shoes, the forces placed on the shoe when it made contact with the sidewall, the effect of the escalator's speed, the impact of the gap between the step and the sidewall, and the amount of friction created by the improperly maintained escalator – just to name a few.

Def.'s Reply Mem. at 4.  Geshke rather oddly responds that Leyden "was never disclosed as an expert on the issue of defective design," Opp'n Mem. at 5 n.1 – oddly, because it is not clear what role Geshke envisions for Leyden other than that of an expert witness at trial.  From the pleadings, it appears that Geshke intends to forgo expert testimony, and rely simply on "Crocs' own admissions and the irrefutable METI findings to establish CROCS' defective design."[15]  *Id.*

With regard to the METI-NITE findings, Geshke contends that "the Japanese government . . . concluded that CROCS were far more susceptible to escalator entrapments than any other type of footwear tested."[16]  Opp'n Mem. at 6.  While one

_____

[15] Geshke does not argue that this is one of those rare cases in which the doctrine of *res ipsa loquitur* renders expert evidence unnecessary.  *See Lipman v. Lustig*, 346 Mass. 182, 184 (1963); *Edwards v. Boland*, 41 Mass. App. Ct. 375, 379-380 (1996). Rather, she contends that the METI report, complaints of prior instances of escalator entrapment, and the Kids Blaze design are sufficient to reach a jury on the defective design claims.  As will be shown, none of this proffered evidence would be admissible at trial.

[16] This statement as to what "the Japanese government concluded" is simply not true and appears nowhere in the NITE report.  What the NITE report does say is that of the four types of shoes it tested, "resin sandals" were the most likely to become entrapped in an escalator.  NITE relates that it purchased seven different makes of resin

15

of the NITE videos appears to show a shoe with the name "CROCS" imprinted on a foot strap (it is difficult for the court to discern with any certainty), this cameo glimpse of a single purported CROCS shoes is insufficient to render the NITE report, and more particularly its conclusions as they might relate to CROCS shoes, admissible at trial. Moreover, the METI-NITE report has never been properly authenticated. *See* Fed. R. Evid. 902(3) (setting out the requirements for authenticating a foreign public document, including its certification by an appropriate foreign official or a U.S. consular officer); *United States v. De Jongh*, 937 F.2d 1, 4 (1st Cir. 1991) (finding a public document inadmissible where its proponent failed to comply with the requisites of Rule 902); *Starski v. Kirzhnev*, 2011 WL 923499, at *5 (D. Mass. Mar. 15, 2011) (same).

Even assuming that the requirements of Rule 902 had been met, there is nothing in the NITE report that Geshke connects by expert testimony or other evidence to the specific facts of N.K.'s case. Specifically, there is no identification of the make or model of the shoes involved in the NITE entrapment replications (NITE tested seven undifferentiated types of resin sandal); the model of the escalator specific to each

---

sandals for testing purposes, but the report identifies none of them by make or model.

entrapment (NITE conducted its tests on four different Japanese makes of escalator)[17]; the sandals' contact location; the tensile and compression loads; the "hardness" or "thickness" of the sandals; the dynamic friction coefficient; and/or the angle of the entrapment.  *See* Pl.'s Ex. 8 at  11-15, 22-30.[18]  Rule 702 of the Federal Rule of Evidence admits the opinion testimony of an expert witness where the opinion will "assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702 is particularly relevant when scientific and technical matters are critical to the resolution of disputed facts.  Without expert testimony reliably relating the contents of the METI-NITE report and its conclusions to the circumstances of N.K.'s accident, the report is doubly inadmissible.[19]

    With regard to Geshke's second category of proposed evidence, even assuming

---

[17] In attempting to replicate the escalator entrapments, NITE subjected eleven different shoe models to 60 tests on four different makes of escalator (2,400 tests total). The first escalator, which was treated with a low-friction material (as required by Japanese industry codes), did not entrap any resin sandals; the second untreated escalator entrapped one; the third untreated escalator entrapped ten; and the fourth untreated escalator entrapped 60 sandals.  Pl.'s Ex. 8 at 14-15.

[18] Olson testified that he has no knowledge of any government or private entity that "conducted side-by-side testing of CROCS as against other types of footwear on different escalators to determine the number of times in which the shoes were entrapped in escalators."  Pl.'s Ex. 16 - Olson Dep. at 235.

[19] "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

the accuracy of Geshke's estimate of some 300 (almost all unidentified) incidents of CROCS escalator entrapments, Geshke offers no evidence about the circumstances in which these alleged entrapments occurred, their cause, whether any personal injury resulted, the types of escalator involved (or their condition), or whether warnings had been posted and ignored. *See* Fed. R. Evid. 401.

Finally, Geshke's evidence of "Crocs' own admissions" boils down to this. Geshke maintains that Crocs concedes the existence of a safer and feasible alternative design – the Kids Blaze model – and that this is enough to establish her defective design claim. In the first instance, Crocs concedes nothing of the sort. Moreover, while it is undisputed that Crocs designed the Kids Blaze model to mollify METI's concerns, Geshke offers no evidence that the Kids Blaze design was in fact safer for a child to wear while riding an escalator or that the Japanese government ever required any permanent change in the design of CROCS shoes sold in Japan.[20]

Count I - Negligence, Failure to Warn

A manufacturer has a duty to provide the "average" consumer with adequate warnings and instructions about the nature and extent of any foreseeable danger accompanying the use or foreseeable misuse of the product. *See Mitchell v. Sky*

_____

[20] Crocs states without contradiction that the Kids Blaze model is no longer sold in Japan because of a lack of enthusiasm for the product and a preference for the original CROCS model among consumers.

18

*Climber, Inc.*, 396 Mass. 629, 631 (1986); *H.P. Hood & Sons, Inc. v. Ford Motor Co.*, 370 Mass. 69, 75 (1976); *Welch v. Keene Corp.*, 31 Mass. App. Ct. 157, 163 (1991). A product may also be deemed defective by reason of a failed warning if the omitted or inadequate notice or instruction would have reduced or avoided the foreseeable risks of harm. *See* Restatement (Third) of Torts: Products Liability § 2(c) (1998). A manufacturer, however, has no duty to warn users of a possible risk that is outside the zone of foreseeable use or misuse of the product. *Mitchell*, 396 Mass. at 632.

In this case, in light of the undisputed facts, whether Geshke failed to read the posted warnings, or simply disregarded them, Crocs persuasively argues that an earlier redundant warning would have done nothing to avert N.K.'s accident. When an existing warning[21] "clearly called attention to the dangers to be avoided" and "there [is] no evidence that an additional or different warning would have so alerted the plaintiff [so] that the accident would not have occurred," no reasonable jury could find for a plaintiff on a failure-to-warn theory. *Bell v. Wysong & Miles Co.*, 26 Mass. App. Ct. 1011, 1013 (1988) (reversing the trial court and dismissing a failure to warn claim on this basis). *See also Plante v. Hobart Corp.*, 771 F.2d 617, 621 (1st Cir. 1985)

---

[21] As related earlier, KONE, the manufacturer of the Aquarium escalator, and the MBTA, its operator, posted signs warning riders to "Avoid sides," "Always face forward," "Attend children," and "Keep tennis shoes away from sides."

(affirming directed verdict for manufacturer when the court could "not see how one can reasonably say that defendants were negligent in failing to furnish even more warnings about the dangers" at issue); *Bavuso v. Caterpillar Indus., Inc.*, 408 Mass. 694, 701-702 (1990) (reversing jury verdict and the district court's entry of judgment in favor of the plaintiff because "a warning beyond the warnings given could not have made the danger any more obvious").[22]

Count II - Breach of Express[23] and Implied Warranties

------

[22] Crocs also argues that the open and obvious danger posed by escalators to young children precludes recovery on a failure-to-warn theory. There is no liability for failing to warn "of a risk or hazard which [the consumer] appreciated to the same extent as a warning would have provided." *Slate v. Bethlehem Steel Corp.*, 400 Mass. 378, 382 (1987). *See also Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 275 (1st Cir. 2003). Crocs claims that "Geshke admitted that she was aware of the open and obvious danger of escalators; [and that] she acknowledged warning her children about escalators when they were younger because it was 'common sense' that 'a moving staircase' presented a risk of injury." Def.'s Mem. at 16. This is a mischaracterization of Geshke's testimony. She stated that "she didn't want [her children] to play on them [escalators]" . . . but . . . [she] didn't think of them as dangerous in the sake of them really getting hurt. I think I might have thought that there could be an accident, but I didn't think of them as dangerous." Geshke Dep. at 37. Nonetheless, Geshke's proffer that had the CROCS shoes carried a point-of-sale hangtag warning of the dangers of escalators, she would never have purchased them for N.K., and therefore the accident would never have happened, is too speculative to be admissible at trial. *See Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 15 n.8 (1st Cir. 2001). Because Geshke was provided with an adequate warning immediately prior to the accident, it is unnecessary for the court to consider Crocs's second line of defense on the failure-to-warn claim.

[23] Geshke does not allege any express warranty on the part of Crocs, other than noting an advertising claim that Crocs sells "all purpose shoes for comfort and

Under Mass. Gen. Laws c. 106, § 2-314, "a warranty that the goods shall be merchantable is implied in a contract for their sale . . . . Goods to be merchantable must at least be . . . fit for the ordinary purposes for which such goods are used . . . . " Massachusetts equates "a breach of the implied warranty of merchantability, that goods be 'fit for the ordinary purposes for which such goods are used,' [Mass. Gen. Laws ch.] 106, § 2-314(2)(c), with the sale of an 'unreasonably dangerous' product" as set forth in Restatement (Second) of Torts § 402A(1) (1965).[24]  *Commonwealth v. Johnson Insulation*, 425 Mass. 650, 660 (1997).  S*ee also Haglund v. Philip Morris, Inc.*, 446 Mass. 741, 746 (2006) ("Warranty liability is . . . 'congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965).").  "A product may be unreasonably dangerous because of a defect in design. . . . Alternatively, a product may be considered to be unreasonably dangerous because of the absence of an adequate warning, sufficient to alert those who may be sensitive

fashion."  Compl. ¶ 29.

[24] Restatement (Second) of Torts § 402A(1) provides,

One who sells any product in a defective condition unreasonably dangerous to the user of consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

21

to the product and to allow users to balance the risk of harm against the product's social utility." *Johnson Insulation*, 425 Mass. at 661; *see also Haglund*, 446 Mass. at 747 ("Warranty liability may be premised either on the failure to warn . . . or . . . on defective design."). Because Geshke is unable to prevail on either of her negligence claims (defective design and failure-to-warn), it follows that the implied warranty claim fails as well.[25]

ORDER

For the foregoing reasons, the motion for summary judgment is <u>ALLOWED</u>. The Clerk will enter judgment for Crocs, and close the case.

SO ORDERED.

/s/ Richard G. Stearns

---

[25] The remaining counts of Geshke's Complaint can be summarily addressed. Count III (Defective Design) is duplicative of the failed negligence claim in Count I. "[A] claim for loss of consortium [Count IV] requires proof of a tortious act that caused the claimant's spouse [or child] personal injury. . . . Although we have determined that a claim for loss of consortium is independent of the spouse's cause of action, . . . we have not repudiated the implicit prerequisite that the injured spouse have a viable claim." *Sena v. Commonwealth*, 417 Mass. 250, 264 (1994). As Geshke's negligence claims do not survive, neither does this claim. *See also Doe v. D'Agostino*, 367 F. Supp. 2d 157, 178 (D. Mass. 2005). Punitive damages (Count V) may not be awarded unless authorized by statute. *See Flesner v. Technical Commc'ns Corp.*, 410 Mass. 805, 813 (1991). The only statutory claim, Count II (breach of an implied warranty, Mass. Gen. Laws ch.106, § 2-314), does not authorize an award of punitive damages (even assuming the negligence/implied warranty claim were to survive summary judgment).

22

_____

UNITED   STATES   DISTRICT   JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11567-RGS

NANCY GESHKE, individually
and as guardian of N.K., a minor

v.

CROCS, INC.,

MEMORANDUM AND ORDER ON
CROCS, INC.'S MOTION FOR SUMMARY JUDGMENT

September 7, 2012

STEARNS, D.J.

This case arose from a regrettable accident on an escalator at the Massachusetts

Bay Transportation Authority (MBTA) Aquarium Station.  N.K., an eight-year-old girl,

caught her shoe in the side skirt of the escalator, injuring her toe.  N.K.'s shoe was a

popular clog design marketed under the trade name CROCS, by Crocs, Inc. (Crocs),

a Delaware corporation with an expansive worldwide distribution network.  A five-

count Complaint brought on N.K.'s behalf by her mother, Nancy Geshke, alleges a

design defect in the CROCS shoe and a failure on the part of Crocs to warn of the

latent danger CROCS shoes posed to young children riding escalators.[1]

---

[1] Nancy Geshke purchased the pair of children's size 1-3 CROCS from a Crocs
retail outlet in Santa Monica, California, on September 5, 2009.  According to Geshke,
there were no warning tags attached to the shoes or their packaging.  Geshke Dep. at

Discovery now being complete, Crocs moves for summary judgment.  Crocs contends that Geshke's failure to support her claim of a design defect (or the feasability of an "alternative 'safer' design") with expert testimony precludes a jury finding of liability.  With respect to the failure-to-warn claim, Crocs maintains that Geshke's disregard of the conspicuous warnings posted by the MBTA at the entrance to the escalator obviates any suggestion that an earlier (and redundant) admonition from Crocs would have influenced Geshke's conduct, and through her, that of N.K.

Geshke contends that expert testimony is unnecessary because Crocs itself – in response to prior accidents and the "irrefutable testing and findings of the Japanese government" – has shown that it is possible to design a safer version of the CROCS shoe.  Opp'n Mem. at 1-2.  Moreover, Geshke alleges that she would never have purchased the CROCS for N.K. had she known of the risk of the shoe becoming entangled in an escalator.  Geshke maintains that her testimony to that effect is sufficient to meet her burden of raising a jury-worthy issue of disputed fact on the issue of causation.

## BACKGROUND

The following undisputed facts are taken from Crocs's Statement of Facts (SOF)

---

72.

- Dkt # 61, and Geshke's Statement of Additional Facts (SOAF) - Dkt # 64.

In July of 2010, Nancy Geshke, eight-year-old N.K., her nine-year-old brother, and their father, Dr. Peter Kerndt (Nancy Geshke's husband), visited Boston on a vacation trip. On July 19, 2010, the Geshke family boarded an MBTA escalator at the Aquarium Station carrying patrons to the lower-level train platform. There were conspicuous warnings posted at the entrance to the escalator. A bright yellow sign depicted a woman standing next to her child on an escalator and holding the child's hand, accompanied by the following text:

> CAUTION - Passengers Only - No Bare Feet - Hold Handrail - Attend Children - Avoid Sides.

A second yellow warning sign cautioned:

> SAFETY RULES - 1. No Strollers; 2. Hold handrails; 3. Keep tennis shoes away from sides; 4. No bare feet; 5. Always face forward; 6. No children unattended. PARENTS - Your children must obey these rules.

While Nancy Geshke and her husband do not dispute the presence of the warning signs, they each testify as to having no memory of having seen them.[2] They

---

[2] Geshke makes much of the testimony of Tia Mattson, Crocs's Director of Global Public Relations, that during a 2009 family vacation in Hawaii with her husband and CROCS-wearing twelve-year-old stepson, she did not recall seeing warning signs at the entrances to the escalators or moving sidewalks at the Denver or Honolulu airports. Pl.'s Ex. 20 – Mattson Dep. at 16. The relevance of Mattson's testimony is doubtful at best, as it would not be admissible at trial on the issue of the legal consequences of the warnings posted at the Aquarium Station or whether Geshke's admitted failure to heed them is fatal to her claim.

do admit to having seen similar warning signs while riding escalators elsewhere.

As the Geshke family stepped onto the escalator, N.K. and her brother went first, several steps ahead of their parents.  N.K. was approximately five steps (one witness testified that she was three steps) in front of her mother.  Nancy Geshke testified that at ages eight and nine, she felt the children were mature enough to ride the escalator without adult supervision.  As the escalator descended, N.K.'s right foot became caught between the moving step and the escalator's static side skirt.  Nancy Geshke could see her daughter's right foot "contorted, turned, and standing up" at a 90 degree angle. Geshke Dep. at 57.

Hearing N.K. scream, Waleata Odware, an MBTA employee at Aquarium Station, saw N.K. with her right CROC trapped in the side skirt of the escalator. Odware could see that N.K.'s foot was still in the shoe.  Her foot had been twisted sideways as the escalator pulled her downward.  Fearing that N.K. might be dragged into the comb plate at the bottom of the escalator, Odware attempted to halt the escalator, but was unable to engage the braking mechanism.  N.K.'s father also frantically pressed the escalator's emergency stop button, but with no immediate result.

Alan Dumont, a fellow passenger, witnessed the accident.  As he reached the bottom of the escalator, he heard screaming.  He turned and saw N.K. and her mother.

4

It was apparent that N.K.'s foot had been caught in the escalator. After a futile attempt to engage the emergency stop button, Dumont ran up the adjacent staircase to assist Nancy Geshke in freeing N.K.'s foot. Dumont saw that N.K.'s "right shoe got ingested and pulled her toe, her big toe into the side of the escalator." Pl.'s Ex. 4. – Dumont Dep. at 9. Dumont testified that, at that point, "we were in a panic. It was coming to the end of the runoff . . . ." *Id.* In an effort to stop the escalator, Dumont, with as much force as he could summon, jammed the heel of his right sneaker into the side aperture of the moving escalator. Ultimately, Dumont was able to extricate N.K.'s foot from her shoe. He testified that "[t]he mother seemed to be overcome by anxiety or the situation, I helped lift her up, she was about to faint, and I pulled the mother to the side, and I was telling her that her daughter was okay." *Id.* The escalator came to a stop some 15 to 20 seconds after N.K.'s foot was freed.

In the aftermath of the accident, John Flynn, a KONE Corporation (the manufacturer and installer of the escalator) mechanic, responded to an MBTA service call.[3] Flynn inspected the escalator and found it to be in "safe working order." He contacted an inspector at the Massachusetts Department of Public Safety, who gave permission to put the escalator back in service. *See* Pl.'s Ex. 6 – Flynn Dep. at 51, 65,

_____

[3] Flynn has been employed by KONE as an escalator and elevator maintenance technician since 1962. During his career, he has responded to a number of escalator entrapment incidents. SOAF ¶ 18.

5

and 78-79.

In May of 2008, the Japanese Ministry of Economy, Trade and Industry (METI) issued a "Findings Report for Study of Sandal Entrapment Accidents in Escalators." The study was conducted by Japan's National Institute of Technology and Evaluation (NITE). The study analyzed various types of footwear "and their relation to escalator entrapment."[4]  *Id*. at 1.   It was prompted by "the alarming frequency of these accidents" – "a total of 66 . . . as of the end of March [of 2009]." *Id.*   The style of shoe that appears to most resemble a CROCS was identified in the study as a "resin sandal."  NITE's testing determined that a sandal shoe design figured in 65 of the 66 entrapments that had been reported.  NITE conducted thousands of tests on resin sandals, rubber boots, sneakers, and flip-flop sandals using different models of escalators.  Of the 66 entrapments NITE was able to replicate, all but two involved resin sandals.  *Id*. at 14-18.  Video footage of NITE's testing includes a sandal with what appears to be the "CROCS" brand name stamped on its foot strap, being turned and stuck in the side of an escalator, although the report does not identify the CROCS

---

[4] The study is available on the Japanese government's website at www.nite.go.jp/jiko/e/monitor/2008pdf/fy2008_sandals.pdf   (last visited Sept. 7, 2012).  Geshke provided the court with a DVD of the physical testing and a written copy of the study itself. *See* Pl.'s Ex. 8.  At oral argument, Crocs's counsel agreed that the currently posted version of the report differs in some respects from the one attached to Geshke's summary judgment pleadings.

make by name.  *See* Pl.'s Ex. 9.

In the wake of the study, on May 1, 2008, Shigeo Moridaira, the general manager of Crocs-Japan, emailed his colleagues in the United States describing "one of the urgent and most important requests," namely, METI had requested that Crocs develop a "harder cros-lite" material for its footwear marketed in Japan and that it find a "more less friction cubic dip film or paint."  Pl.'s Ex. 11.  He added that because of the "escalator issue Ministry asked us to start selling new products which can reduce accident by end of July . . . mid of May they want to test with those samples."  *Id*.

On May 14, 2008, John McCarvel, then Crocs's Vice-President for Asia and worldwide management,[5] sent an email to his subordinates in Crocs-Japan , attaching photographs to be used at the "meeting with METI on Thursday" showing Crocs's "redesign" of the CROCS shoe.  *See* Pl.'s Ex. 12 at 1.  On July 15, 2008, Megan Welch, Crocs's senior director of merchandising, told McCarvel and Erik Olson[6] that

─────────────────────

[5] In February of 2010, McCarvel became Crocs's CEO.

[6] Erik Olson is currently Crocs's Director of Product Development.  Crocs identified him during discovery as a person with knowledge of the design, manufacturing, testing, and footwear specification of CROCS shoes.  Among his areas of identified expertise were Crocs's responses to safety concerns expressed by METI and the U.S. Consumer Product Safety Commission.  Olson testified to the redesign of a CROCS shoe with a reduced co-efficient of friction, but over plaintiff's objections, asserted attorney-client privilege when asked further questions about the design and testing of the original CROCS shoe.  *See* SOAF ¶¶ 34-37.

the new CROCS design would take into account "friction [as] the most important factor," and that the re-design would incorporate "increased hardness." Ultimately, Crocs decided against a recall of its Japan stock of the original design CROCS shoes because the "[M]inistry has not asked us to pull the current product, they have just asked us to bring a safer, improved product to market."[7] Welch further wrote that Crocs's redesigned footwear "should suffice as a long term solution," which it intended to "propose to [the] Japanese ministry showing test results of changes in friction, hardness, etc."[8]

On August 8, 2008, Olson and others on Crocs's Engineering Change Committee were asked to approve (or reject) an Engineering Change Order (ECO) as a prelude to releasing the redesigned CROCS "Kids Blaze" shoe in Japan and ("later") in "other countries in Asia."[9] According to the ECO, the Kids Blaze would be made of a harder material and coated with a matte (non-glossy) finish. The Kids Blaze would also be sold with an escalator warning hangtag. The Kids Blaze was introduced in Japan as an alternative to the traditional CROCS model shoe, but was later pulled

---

[7] Pl.'s Ex. 13 - July 15, 2008 email from Megan Welch.

[8] *Id*. On July 22, 2008, Welch sent an email to Olson and McCarvel asking whether the testing on the newly designed footwear "all produce the same friction results, or is one more slippery than the others?" Pl.'s Ex. 14 - July 22, 2008 email.

[9] Pl.'s Ex. 15 - August 8, 2008 email from Rita Gariss.

from the market because almost no one wanted to buy it.

Sarah DiMartino, currently the manager of Crocs's customer service department, testified that she had received (maybe more than twenty; definitely more than ten) "complaints of CROCS being trapped in an escalator."  Pl.'s Ex. 19 – DiMartino Dep. at 8.    DiMartino created an escalator incident form for Crocs personnel to use when fielding escalator entrapment complaints.  *Id*. at 55-56.  She designed the form with the object of obtaining consistent information from complainants.  *Id*. at 57-58.

DiMartino's records indicate that a handful of customers mentioned that they had heard of "other similar incidents."[10]  At least one parent inquired whether there was an issue with the "material used for CROCS that would contribute to feet getting caught in escalators."  *Id*. at 89.  DiMartino's standard response was to assure callers that "CROCS was committed to safety," "that CROCS shoes are safe and do not present a hazard," and that "CROCS continues to monitor the use and safety performance of its footwear."  *Id*. at 106.  In most cases, DiMartino and her co-workers would offer to send a complimentary replacement pair of CROCS to

---

[10] Geshke contends that Crocs received more than 300 reports ("directly or indirectly") that children wearing CROCS shoes had been involved in entrapment incidents on moving escalators.  Crocs has not acknowledged an exact number of incidents, only that it has received reports of accidents.

consumers who complained about a mangled shoe.  DiMartino did not follow up with

parents who complained, nor was she aware of anyone else at Crocs who did so.  *Id.*

at 111.

Nancy Geshke filed this action on behalf of N.K. and herself individually

against Crocs in September of 2010.[11]  Crocs filed a third-party complaint against

KONE and the MBTA on October 28, 2010.  The third-party complaint was dismissed

with prejudice on June 18, 2012.  The summary judgment motion by Crocs is the only

motion presently pending before the court.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  "To succeed, the moving party must show that

there is an absence of evidence to support the nonmoving party's position."  *Rogers*

*v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).  "[C]onjecture cannot take the place of

proof in the summary judgment calculus."  *Bennett v. Saint-Gobain Corp.*, 507 F.3d

23, 31 (1st Cir. 2007).  Rule 56 "mandates the entry of summary judgment . . . upon

---

[11] The Complaint alleges claims of negligence (Count I); breach of express and implied warranties (Count II); defective design (Count III); loss of consortium (Count IV); and punitive damages based on a "willful pattern of wanton and depraved indifference" (Count V).

10

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Crocs moves for summary judgment asserting that Jerry Leyden, Geshke's designated expert witness, is unable to "testify that Crocs' shoes are inherently defective as designed, or the feasibility of any alternative 'safer' design," both of which are essential elements of a defective design claim under Massachusetts law. Crocs also contends that Geshke's failure-to-warn claim fails because of her inability to show causation in light of the fact that she was presented with conspicuous warnings about the dangers of letting young children ride unsupervised on an escalator immediately prior to the accident, warnings which she failed to heed. "Therefore, as a matter of law, no warning from Crocs – at the point of sale eight months earlier – could have changed the circumstances of what occurred." Def.'s Mem. at 2.

The first point of dispute is whether Geshke's claims are to be resolved under Massachusetts or California law. Crocs, a Delaware corporation with a principal place of business in Colorado, argues that Massachusetts law applies. Geshke, a California citizen who purchased the CROCS in California, asserts that California products liability law is governing (although she opted to file the action in Massachusetts and cites only to Massachusetts cases in her brief).

11

Massachusetts has supplanted the traditional choice of law rule, which looked to the substantive law of the state where the alleged wrong occurred, with the "functional" approach of Restatement (Second) of Conflict of Laws (1971). *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985). The "new" approach notwithstanding, under § 145 of the Restatement, unless another state has a more significant relationship to the underlying cause of action, tort claims remain governed by the law of the state in which the alleged injury occurred.[12]  *See Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170, 174 (D. Mass. 2010), citing *Cohen v. McDonnell Douglas Corp.*, 389 Mass. 327, 333-334 (1983).  *See also Lou v. Otis Elevator Co.*,

---

[12] Restatement (Second) of Conflict of Laws § 145 provides as follows:

 (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Restatement (Second) of Conflict of Laws] § 6.

 (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

77 Mass. App. Ct. 571, 583-584 (2010) ("Massachusetts generally follows a functional approach to resolving choice of law questions on substantive matters, eschewing reliance on any particular choice-of-law doctrine. . . . Though we do not tie our analysis to any single doctrine, examination of our cases reveals that we often find useful guidance in the Restatement (Second) of Conflict of Laws.").  As the "contacts" identified by the Restatement as the critical considerations to be weighed in deciding the choice of law lean heavily towards the choice of Massachusetts (particularly § 145(2)(a), (b), and (d)), the court will apply Massachusetts law.  *See Pevoski v. Pevoski*, 371 Mass. 358, 359 (1976) ("In this Commonwealth, lex loci delicti has been firmly established as the general tort conflicts rule.").

Count I - Negligence/Negligent Design

Proof of design negligence requires satisfaction of the following elements:  (1) the manufacturer's failure to exercise a reasonable degree of care under the circumstances;[13] (2) proximate causation; and (3) injury and/or loss.  *See Ulwick v.*

---

[13] "A manufacturer is under a duty to design its product with reasonable care to eliminate avoidable dangers." *Simmons v. Monarch Mach. Tool Co.*, 413 Mass. 205, 211 (1992), abrogated on other grounds by *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1 (1998).  However, there is no duty on the part of the manufacturer to design a product that is risk free or risk proof; nor does the manufacturer have a duty to guard against dangers which are only remotely possible or highly speculative. *Back v. Wickes Corp.*, 375 Mass. 633, 640-641 (1978).  The test for whether the product is defective is one of reasonableness rather than one of perfection. *See Smith v. Ariens Co.*, 375 Mass. 620, 624 (1978).

*DeChristopher*, 411 Mass. 401, 408 (1991); *Beaver v. Costin*, 352 Mass. 624, 626 (1967); *Scott v. Thompson*, 5 Mass. App. Ct. 372, 374 (1977). "In evaluating the adequacy of a product's design, [the fact-finder] should consider, among other factors, 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.'" *Back*, 375 Mass. at 642, quoting *Barker v. Lull Eng'g Co.*, 573 P.2d 443, 455 (Cal. 1978). *See also Uloth v. City Tank Corp.*, 376 Mass. 874, 880-881 (1978) ("[T]here is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery.").

Crocs maintains that Geshke's design negligence claim fails as a matter of law because her expert witness, Jerry Leyden, is unable to opine on any of the crucial issues involving matters of product design.[14]

Because plaintiffs' defect claim inherently turns on the interplay between

---

[14] Leyden concedes that he has never seen any of the design or testing specifications for the Kids Blaze model shoe – or for any other model of CROCS shoes. Leyden Dep. at 195-196. Leyden did no analysis of the engineering changes between N.K.'s allegedly dangerous CROCS design and the Kids Blaze line, nor has he suggested an alternative feasible and safer design. *Id.* Leyden also testified that he has no opinion as to whether the Kids Blaze shoe would perform any differently than any other shoe if entrapped in an escalator. *Id.* at 196-197.

14

footwear and an escalator, it implicates particularly complex engineering issues such as the physical characteristics of the materials that comprised N.K.'s shoes, the forces placed on the shoe when it made contact with the sidewall, the effect of the escalator's speed, the impact of the gap between the step and the sidewall, and the amount of friction created by the improperly maintained escalator – just to name a few.

Def.'s Reply Mem. at 4. Geshke rather oddly responds that Leyden "was never disclosed as an expert on the issue of defective design," Opp'n Mem. at 5 n.1 – oddly, because it is not clear what role Geshke envisions for Leyden other than that of an expert witness at trial. From the pleadings, it appears that Geshke intends to forgo expert testimony, and rely simply on "Crocs' own admissions and the irrefutable METI findings to establish CROCS' defective design."[15] *Id.*

With regard to the METI-NITE findings, Geshke contends that "the Japanese government . . . concluded that CROCS were far more susceptible to escalator entrapments than any other type of footwear tested."[16] Opp'n Mem. at 6. While one

---

[15] Geshke does not argue that this is one of those rare cases in which the doctrine of *res ipsa loquitur* renders expert evidence unnecessary. *See Lipman v. Lustig*, 346 Mass. 182, 184 (1963); *Edwards v. Boland*, 41 Mass. App. Ct. 375, 379-380 (1996). Rather, she contends that the METI report, complaints of prior instances of escalator entrapment, and the Kids Blaze design are sufficient to reach a jury on the defective design claims. As will be shown, none of this proffered evidence would be admissible at trial.

[16] This statement as to what "the Japanese government concluded" is simply not true and appears nowhere in the NITE report. What the NITE report does say is that of the four types of shoes it tested, "resin sandals" were the most likely to become entrapped in an escalator. NITE relates that it purchased seven different makes of resin

15

of the NITE videos appears to show a shoe with the name "CROCS" imprinted on a foot strap (it is difficult for the court to discern with any certainty), this cameo glimpse of a single purported CROCS shoes is insufficient to render the NITE report, and more particularly its conclusions as they might relate to CROCS shoes, admissible at trial. Moreover, the METI-NITE report has never been properly authenticated. *See* Fed. R. Evid. 902(3) (setting out the requirements for authenticating a foreign public document, including its certification by an appropriate foreign official or a U.S. consular officer); *United States v. De Jongh*, 937 F.2d 1, 4 (1st Cir. 1991) (finding a public document inadmissible where its proponent failed to comply with the requisites of Rule 902); *Starski v. Kirzhnev*, 2011 WL 923499, at *5 (D. Mass. Mar. 15, 2011) (same).

Even assuming that the requirements of Rule 902 had been met, there is nothing in the NITE report that Geshke connects by expert testimony or other evidence to the specific facts of N.K.'s case. Specifically, there is no identification of the make or model of the shoes involved in the NITE entrapment replications (NITE tested seven undifferentiated types of resin sandal); the model of the escalator specific to each

-----------------

sandals for testing purposes, but the report identifies none of them by make or model.

entrapment (NITE conducted its tests on four different Japanese makes of escalator)[17]; the sandals' contact location; the tensile and compression loads; the "hardness" or "thickness" of the sandals; the dynamic friction coefficient; and/or the angle of the entrapment. *See* Pl.'s Ex. 8 at 11-15, 22-30.[18]  Rule 702 of the Federal Rule of Evidence admits the opinion testimony of an expert witness where the opinion will "assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702 is particularly relevant when scientific and technical matters are critical to the resolution of disputed facts.  Without expert testimony reliably relating the contents of the METI-NITE report and its conclusions to the circumstances of N.K.'s accident, the report is doubly inadmissible.[19]

    With regard to Geshke's second category of proposed evidence, even assuming

---

[17] In attempting to replicate the escalator entrapments, NITE subjected eleven different shoe models to 60 tests on four different makes of escalator (2,400 tests total). The first escalator, which was treated with a low-friction material (as required by Japanese industry codes), did not entrap any resin sandals; the second untreated escalator entrapped one; the third untreated escalator entrapped ten; and the fourth untreated escalator entrapped 60 sandals.  Pl.'s Ex. 8 at 14-15.

[18] Olson testified that he has no knowledge of any government or private entity that "conducted side-by-side testing of CROCS as against other types of footwear on different escalators to determine the number of times in which the shoes were entrapped in escalators."  Pl.'s Ex. 16 - Olson Dep. at 235.

[19] "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

the accuracy of Geshke's estimate of some 300 (almost all unidentified) incidents of CROCS escalator entrapments, Geshke offers no evidence about the circumstances in which these alleged entrapments occurred, their cause, whether any personal injury resulted, the types of escalator involved (or their condition), or whether warnings had been posted and ignored. *See* Fed. R. Evid. 401.

Finally, Geshke's evidence of "Crocs' own admissions" boils down to this. Geshke maintains that Crocs concedes the existence of a safer and feasible alternative design – the Kids Blaze model – and that this is enough to establish her defective design claim. In the first instance, Crocs concedes nothing of the sort. Moreover, while it is undisputed that Crocs designed the Kids Blaze model to mollify METI's concerns, Geshke offers no evidence that the Kids Blaze design was in fact safer for a child to wear while riding an escalator or that the Japanese government ever required any permanent change in the design of CROCS shoes sold in Japan.[20]

Count I - Negligence, Failure to Warn

A manufacturer has a duty to provide the "average" consumer with adequate warnings and instructions about the nature and extent of any foreseeable danger accompanying the use or foreseeable misuse of the product. *See Mitchell v. Sky*

---

[20] Crocs states without contradiction that the Kids Blaze model is no longer sold in Japan because of a lack of enthusiasm for the product and a preference for the original CROCS model among consumers.

*Climber, Inc.*, 396 Mass. 629, 631 (1986); *H.P. Hood & Sons, Inc. v. Ford Motor Co.*, 370 Mass. 69, 75 (1976); *Welch v. Keene Corp.*, 31 Mass. App. Ct. 157, 163 (1991).  A product may also be deemed defective by reason of a failed warning if the omitted or inadequate notice or instruction would have reduced or avoided the foreseeable risks of harm.  *See* Restatement (Third) of Torts: Products Liability § 2(c) (1998).  A manufacturer, however, has no duty to warn users of a possible risk that is outside the zone of foreseeable use or misuse of the product.  *Mitchell*, 396 Mass. at 632.

In this case, in light of the undisputed facts, whether Geshke failed to read the posted warnings, or simply disregarded them, Crocs persuasively argues that an earlier redundant warning would have done nothing to avert N.K.'s accident.  When an existing warning[21] "clearly called attention to the dangers to be avoided" and "there [is] no evidence that an additional or different warning would have so alerted the plaintiff [so] that the accident would not have occurred," no reasonable jury could find for a plaintiff on a failure-to-warn theory.  *Bell v. Wysong & Miles Co.*, 26 Mass. App. Ct. 1011, 1013 (1988) (reversing the trial court and dismissing a failure to warn claim on this basis).  *See also Plante v. Hobart Corp.*, 771 F.2d 617, 621 (1st Cir. 1985)

---

[21] As related earlier, KONE, the manufacturer of the Aquarium escalator, and the MBTA, its operator, posted signs warning riders to "Avoid sides," "Always face forward," "Attend children," and "Keep tennis shoes away from sides."

(affirming directed verdict for manufacturer when the court could "not see how one can reasonably say that defendants were negligent in failing to furnish even more warnings about the dangers" at issue); *Bavuso v. Caterpillar Indus., Inc.*, 408 Mass. 694, 701-702 (1990) (reversing jury verdict and the district court's entry of judgment in favor of the plaintiff because "a warning beyond the warnings given could not have made the danger any more obvious").[22]

    Count II - Breach of Express[23] and Implied Warranties

---

[22] Crocs also argues that the open and obvious danger posed by escalators to young children precludes recovery on a failure-to-warn theory. There is no liability for failing to warn "of a risk or hazard which [the consumer] appreciated to the same extent as a warning would have provided." *Slate v. Bethlehem Steel Corp.*, 400 Mass. 378, 382 (1987). *See also Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 275 (1st Cir. 2003). Crocs claims that "Geshke admitted that she was aware of the open and obvious danger of escalators; [and that] she acknowledged warning her children about escalators when they were younger because it was 'common sense' that 'a moving staircase' presented a risk of injury." Def.'s Mem. at 16. This is a mischaracterization of Geshke's testimony. She stated that "she didn't want [her children] to play on them [escalators]" . . . but . . . [she] didn't think of them as dangerous in the sake of them really getting hurt. I think I might have thought that there could be an accident, but I didn't think of them as dangerous." Geshke Dep. at 37. Nonetheless, Geshke's proffer that had the CROCS shoes carried a point-of-sale hangtag warning of the dangers of escalators, she would never have purchased them for N.K., and therefore the accident would never have happened, is too speculative to be admissible at trial. *See Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 15 n.8 (1st Cir. 2001). Because Geshke was provided with an adequate warning immediately prior to the accident, it is unnecessary for the court to consider Crocs's second line of defense on the failure-to-warn claim.

[23] Geshke does not allege any express warranty on the part of Crocs, other than noting an advertising claim that Crocs sells "all purpose shoes for comfort and

Under Mass. Gen. Laws c. 106, § 2-314, "a warranty that the goods shall be merchantable is implied in a contract for their sale . . . . Goods to be merchantable must at least be . . . fit for the ordinary purposes for which such goods are used . . . . " Massachusetts equates "a breach of the implied warranty of merchantability, that goods be 'fit for the ordinary purposes for which such goods are used,' [Mass. Gen. Laws ch.] 106, § 2-314(2)(c), with the sale of an 'unreasonably dangerous' product" as set forth in Restatement (Second) of Torts § 402A(1) (1965).[24] *Commonwealth v. Johnson Insulation*, 425 Mass. 650, 660 (1997). S*ee also Haglund v. Philip Morris, Inc.*, 446 Mass. 741, 746 (2006) ("Warranty liability is . . . 'congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965).""). "A product may be unreasonably dangerous because of a defect in design. . . . Alternatively, a product may be considered to be unreasonably dangerous because of the absence of an adequate warning, sufficient to alert those who may be sensitive

fashion." Compl. ¶ 29.

[24] Restatement (Second) of Torts § 402A(1) provides,

One who sells any product in a defective condition unreasonably dangerous to the user of consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

to the product and to allow users to balance the risk of harm against the product's social utility." *Johnson Insulation*, 425 Mass. at 661; *see also Haglund*, 446 Mass. at 747 ("Warranty liability may be premised either on the failure to warn . . . or . . . on defective design."). Because Geshke is unable to prevail on either of her negligence claims (defective design and failure-to-warn), it follows that the implied warranty claim fails as well.[25]

ORDER

For the foregoing reasons, the motion for summary judgment is <u>ALLOWED</u>. The Clerk will enter judgment for Crocs, and close the case.

SO ORDERED.

/s/ Richard G. Stearns

---

[25] The remaining counts of Geshke's Complaint can be summarily addressed. Count III (Defective Design) is duplicative of the failed negligence claim in Count I. "[A] claim for loss of consortium [Count IV] requires proof of a tortious act that caused the claimant's spouse [or child] personal injury. . . . Although we have determined that a claim for loss of consortium is independent of the spouse's cause of action, . . . we have not repudiated the implicit prerequisite that the injured spouse have a viable claim." *Sena v. Commonwealth*, 417 Mass. 250, 264 (1994). As Geshke's negligence claims do not survive, neither does this claim. *See also Doe v. D'Agostino*, 367 F. Supp. 2d 157, 178 (D. Mass. 2005). Punitive damages (Count V) may not be awarded unless authorized by statute. *See Flesner v. Technical Commc'ns Corp.*, 410 Mass. 805, 813 (1991). The only statutory claim, Count II (breach of an implied warranty, Mass. Gen. Laws ch.106, § 2-314), does not authorize an award of punitive damages (even assuming the negligence/implied warranty claim were to survive summary judgment).

22

_____

UNITED   STATES   DISTRICT   JUDGE